MR. Justice Harlan,
dissenting.*
In these cases the Court holds that seats in the legislatures of six States[1] are apportioned in ways that violate the Federal Constitution. Under the Court’s ruling it is bound to follow that the legislatures in all but a few of the other- 44 States will meet the same fate.[2] These decisions, with Wesberry v. Sanders, 376 U. S. 1, involving congressional districting by the States, and Gray v. Sanders, 372 U. S. 368, relating to elections for statewide office, have the effect of placing basic aspects of state political systems under the pervasive overlordship of the federal judiciary. Once again,[3] I must register my protest.
*722 Preliminary Statement.
Today’s holding is that the Equal Protection Clause of the Fourteenth Amendment requires every State to structure its legislature so that all the members of each house represent substantially the same number of people; other factors may be given play only to the extent that they do not significantly encroach on this basic “population” principle. Whatever may be thought of this holding as a piece of political ideology — and even on that score the political history and practices of this country from its earliest beginnings leave wide room for debate (see the dissenting opinion of Frankfurter, J., in Baker v. Carr, 369 U. S. 186, 266, 301-323) — I think it demonstrable that the Fourteenth Amendment does not impose this political tenet on the States or authorize this Court to do so.
The Court’s constitutional discussion, found in its opinion in the Alabama cases (Nos. 23, 27, 41, ante, p. 533) and more particularly at pages 561-568 thereof, is remarkable (as, indeed, is that found in the separate opinions of my Brothers Stewart and Clark, ante, pp. 588, 587) for its failure to address itself at all to the Fourteenth Amendment as a whole or to the legislative history of the Amendment pertinent to the matter at hand. Stripped of aphorisms, the Court’s argument boils down to the assertion that appellees’ right to vote has been invidiously “debased” or “diluted” by systems of apportionment which entitle them to vote for fewer legislators than other voters, an assertion which is tied to the Equal Protection Clause only by the constitutionally frail tautology that “equal” means “equal.”
Had the Court paused to probe more deeply into the matter, it would have found that the Equal Protection Clause was never intended to inhibit the States in choos *723 ing any democratic method they pleased for the apportionment of their legislatures. This is shown by the language of the Fourteenth Amendment taken as a whole, by the understanding of those who proposed and ratified it; and by the political practices of the States at the time the Amendment was adopted. It is confirmed by numerous state and congressional actions since the adoption of the Fourteenth Amendment, and by the common understanding of the Amendment as evidenced by subsequent constitutional amendments and decisions of this Court before Baker v. Carr, supra, made an abrupt break with the past in 1962;
The failure of the Court to consider any of these matters cannot be excused or explained by any concept of “developing” constitutionalism. It is meaningless to speak of constitutional “development” when both the language and history of the controlling provisions of the Constitution are wholly ignored. Since it can, I think, be shown beyond doubt that state legislative apportion-ments, as such, are wholly free of constitutional limitations, save such as may be imposed by the Republican Form of Government Clause (Const., Art. IY, § 4),[4] the Court’s action now bringing them within the purview of the Fourteenth Amendment amounts to nothing less than an exercise of the amending power by this Court.
So far as the Federal Constitution is concerned, the complaints in these cases should all have been dismissed below for failure to state a cause of action, because what *724 has been alleged or proved shows no violation of any constitutional right.
Before proceeding to my argument it should be observed that nothing done in Baker v. Carr, supra, or in the two cases that followed in its wake, Gray v. Sanders and Wesberry v. Sanders, supra, from which the Court quotes at some length, forecloses the conclusion which I reach.
Baker decided only that claims such as those made here are within the competence of the federal courts to adjudicate. Although the Court stated as its conclusion that the allegations of a denial of equal protection presented “a justiciable constitutional cause of action,” 369 U. S., at 237, it is evident from the Courtis opinion that it was concerned all but exclusively with justiciability and gave no serious attention to the question whether the Equal Protection Clause touches state legislative apportion-ments.[5] Neither the opinion of the Court nor any of the concurring opinions considered the relevant text of the Fourteenth Amendment or any of the historical materials bearing on that question. None of the materials was briefed or otherwise brought to the Courtis attention.[6]
*725 In the Gray case the Court expressly laid aside the applicability to state legislative apportionments of the “one person, one vote” theory there found to require the striking down of the Georgia county unit system. See 372 U. S., at 376, and the concurring opinion of Stewart, J., joined by Clark, J., id., at 381-382.
In Wesberry, involving congressional districting, the decision rested on Art. I, § 2, of the Constitution. The Court expressly did not reach the arguments put forward concerning the Equal Protection Clause. See 376 U. S., at 8, note 10.
Thus it seems abundantly clear that the Court is entirely free to deal with the cases presently before it in light of materials now called to its attention for the first time. To these I now turn.
I.
A. The Language of the Fourteenth Amendment.
The Court relies exclusively on that portion of § 1 of the Fourteenth Amendment which provides that no State shall “deny to any person within its jurisdiction the equal protection of the laws,” and disregards entirely the significance of § 2, which reads:
“Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or *726 other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.” (Emphasis added.)
The Amendment is a single text. It was introduced and discussed as such in the Reconstruction Committee,[7] which reported it to the Congress. It was discussed as a unit in Congress and proposed as a unit to the States,[8] which ratified it as a unit. A proposal to split up the Amendment and submit each section to the States as a separate amendment was rejected by the Senate.[9] Whatever one might take to be the application to these cases of the Equal Protection Clause if it stood alone, I am unable to understand the Court’s utter disregard of the second section which expressly recognizes the States’ power to deny “or in any way” abridge the right of their inhabitants to vote for “the members of the [State] Legislature,” and its express provision of a remedy for such denial or abridgment. The comprehensive scope of the second section and its particular reference to the state legislatures preclude the suggestion that the first section was intended to have the result reached by the Court today. If indeed the words of the Fourteenth Amendment speak for themselves, as the majority’s disregard of history seems to imply, they speak as clearly as may be against the construction which the majority puts on them. But we are not limited to the language of the Amendment itself.
*727 B. Proposal and Ratification of the Amendment.
The history of the adoption of the Fourteenth Amendment provides conclusive evidence that neither those who proposed nor those who ratified the Amendment believed that the Equal Protection Clause limited the power of the States to apportion their legislatures as they saw fit. Moreover, the history demonstrates that the intention to leave this power undisturbed was deliberate and was widely believed to be essential to the adoption of the Amendment.
(i) Proposal of the amendment in Congress. — A resolution proposing what became the Fourteenth Amendment was reported to both houses of Congress by the Reconstruction Committee of Fifteen on April 30, 1866,[10] The first two sections of the proposed amendment read:
“Sec. 1. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
“Sec. 2. Representatives shall be apportioned among the several States which may be included within this Union, according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But whenever, in any State, the elective franchise shall be denied to any portion of its male citizens not less than twenty-one years of age, or in any way abridged except for participation in rebellion or other crime, the basis of representation in such State shall be reduced in the proportion which the number of such male citi *728 zens shall bear to the whole number of male citizens not less than twenty-one years of age.” [11]
In the House, Thaddeus Stevens introduced debate on the resolution on May 8. In his opening remarks, Stevens explained why he supported the resolution although it fell “far short” of his wishes:
“I believe it is all that can be obtained in the present state of public opinion. Not only Congress but the several States are to be consulted. Upon a careful survey of the whole ground, we did not believe that nineteen of the loyal States could be induced to ratify any proposition more stringent than this.” [12]
In explanation of this belief, he asked the House to remember “that three months since, and more, the committee reported and the House adopted a proposed amendment fixing the basis of representation in such way as would surely have secured the enfranchisement of every citizen at no distant period,” but that proposal had been rejected by the Senate.[13]
He then explained the impact of the first section of the proposed Amendment, particularly the Equal Protection Clause.
“This amendment . . . allows Congress to correct the unjust legislation of the States, so far that the *729 law which operates upon one man shall operate equally upon all. Whatever law punishes a white man for a crime shall punish the black man precisely in the same way and to the same degree. Whatever law protects the white man shall afford 'equal’ protection to the black man. Whatever means of redress is afforded to one shall be afforded to all. Whatever law allows the white man to testify in court shall allow the man of color to do the same. These are great advantages over their present codes. Now different degrees of punishment are inflicted, not on account of the magnitude of the crime, but according to the color of the skin. Now color disqualifies a man from testifying in courts, or being tried in the same way as white men. I need not enumerate these partial and oppressive laws. Unless the Constitution should restrain them those States will all, I fear, keep up this discrimination, and crush to death the hated freedmen.” [14]
He turned next to the second section, which he said he considered “the most important in the article.” [15] Its effect, he said, was to fix “the basis of representation in Congress.”[16] In unmistakable terms, he recognized the power of a State to withhold the right to vote:
“If any State shall exclude any of her adult male citizens from the elective franchise, or abridge that right, she shall forfeit her right to representation in the same proportion. The effect of this provision will be either to compel the States to grant universal suffrage or so to shear them of their power as to keep them forever in a hopeless minority in the national Government, both legislative and executive.” [17]
*730 Closing his discussion of the second section, he noted his dislike for the fact that it allowed “the States to discriminate [with respect to the right to vote] among the same class, and receive proportionate credit in representation.” [18]
Toward the end of the debate three days later, Mr. Bingham, the author of the first section in the Reconstruction Committee and its leading proponent,[19] concluded his discussion of it with the following:
“Allow me, Mr. Speaker, in passing, to say that this amendment takes from no State any right that ever pertained to it. No State ever had the right, under the forms of law or otherwise, to deny to any freeman the equal protection of the laws or to abridge the privileges or immunities of any citizen of the Republic, although many of them have assumed and exercised the power, and that without remedy. The amendment does not give, as the second section shows, the power to Congress of regulating suffrage in the several States.” [20] (Emphasis added.)
He immediately continued:
“The second section excludes the conclusion that by the first section suffrage is subjected to congressional law; save, indeed, with this exception, that as the right in the people of each State to a republican government and to choose their Representatives in Congress is of the guarantees of the Constitution, by this amendment a remedy might be given directly for a case supposed by Madison, where treason might change a State government from a republican to a *731 despotic government, and thereby deny suffrage to the people.” [21] (Emphasis added.)
He stated at another point in his remarks:
“To be sure we all agree, and the great body of the people of this country agree, and the committee thus far in reporting measures of reconstruction agree, that the exercise of the elective franchise, though it he one of the privileges of a citizen of the Republic, is exclusively under the control of the States.”[22] (Emphasis added.)
In the three days of debate which separate the opening and closing remarks, both made by members of the Reconstruction Committee, every speaker on the resolution, with a single doubtful exception,[23] assumed without question that, as Mr. Bingham said, supra, “the second section excludes the conclusion that by the first section suffrage is subjected to congressional law.” The assumption was neither inadvertent nor silent. Much of the debate concerned the change in the basis of representation effected by the second section, and the speakers stated repeatedly, in express terms or by unmistakable implication, that the States retained the power to regulate suffrage within their borders. Attached as Appendix A hereto are some of those statements. The resolution was adopted by the House without change on May 10.[24]
*732 Debate in the Senate began on May 23, and followed the same pattern. Speaking for the Senate Chairman of the Reconstruction Committee, who was ill, Senator Howard, also a member of the Committee, explained the meaning of the Equal Protection Clause as follows:
“The last two clauses of the first section of the amendment disable a State from depriving not merely a citizen of the United States, but any person, whoever he may be, of life, liberty, or property without due process of law, or from denying to him the equal protection of the laws of the State. This abolishes all class legislation in the States and does away with the injustice of subjecting one caste of persons to a code not applicable to another. It prohibits the hanging of a black man for a crime for which the white man is not to be hanged. It protects the black man in his fundamental rights as a citizen with the same shield which it throws over the white man. Is if not time, Mr. President, that we extend to the black man, I had almost called it the poor privilege of the equal protection of the law? . . .
“But, sir, the first section of the proposed amendment does not give to either of these classes the right of voting. The right of suffrage is not, in law, one of the privileges or immunities thus secured by the Constitution. It is merely the creature of law. It has always been regarded in this country as the result of positive local law, not regarded as one of those fundamental rights lying at the basis of all society and without which a people cannot exist except as slaves, subject to a depotism [sic].”[25] (Emphasis added.)
Discussing the second section, he expressed his regret that it did “not recognize the authority of the United States over the question of suffrage in the several States *733 at all . . . [26] He justified the limited purpose of the Amendment in this regard as follows:
“But, sir, it is not the question here what will we do; it is not the question what you, or I, or half a dozen other members of the Senate may prefer in respect to colored suffrage; it is not entirely the question what measure we can pass through the two Houses; but the question really is, what will the Legislatures of the various States to whom these amendments are to be submitted do in the premises; what is it likely will meet the general approbation of the people who are to elect the Legislatures, three fourths of whom must ratify our propositions before they have the force of constitutional provisions?
“The committee were of opinion that the States are not yet prepared to sanction so fundamental a change as would be the concession of the right of suffrage to the colored race. We may as well state it plainly and fairly, so that there shall be no misunderstanding on the subject. It was our opinion that three fourths of the States of this Union could not be induced to vote to grant the right of suffrage, even in any degree or under any restriction, to the colored race. . . .
“The second section leaves the right to regulate the elective franchise still with the States, and does not meddle with that right.” [27] (Emphasis added.)
There was not in the Senate, as there had been in the House, a closing speech in explanation of the Amendment. But because the Senate considered, and finally adopted, several changes in the first and second sections, even more attention was given to the problem of voting rights there than had been given in the House. In the *734 Senate, it was fully understood by everyone that neither the first nor the second section interfered with the right of the States to regulate the elective franchise. Attached as Appendix B hereto are representative statements from the debates to that effect. After having changed the proposed amendment to the form in which it was adopted, the Senate passed the resolution on June 8, 1866.[28] As changed, it passed in the House on June 13.[29]
(ii) Ratification by the “loyal” States. — Reports of the debates in the state legislatures on the ratification of the Fourteenth Amendment are not generally available.[30] There is, however, compelling indirect evidence. Of the 23 loyal States which ratified the Amendment before 1870, five had constitutional provisions for apportionment of at least one house of their respective legislatures which wholly disregarded the spread of population.[31] *735 Ten more had constitutional provisions which gave primary emphasis to population, but which applied also other principles, such as partial ratios and recognition of political subdivisions, which were intended to favor sparsely settled areas.[32] Can it be seriously contended that the legislatures of these States, almost two-thirds of those concerned, would have ratified an amendment which might render their own States’ constitutions unconstitutional ?
Nor were these state constitutional provisions merely theoretical. In New Jersey, for example, Cape May County, with a population of 8,349, and Ocean County, with a population of 13,628, each elected one State Senator, as did Essex and Hudson Counties, with populations of 143,839 and 129,067, respectively.[33] In the House, each county was entitled to one representative, which left 39 seats to be apportioned according to population.[34] Since there were 12 counties besides the two already mentioned which had populations over 30,000,[35] it is evident that there were serious disproportions in the House also. In *736 New York, each of the 60 counties except Hamilton County was entitled to one of the 128 seats in the Assembly.[36] This left 69 seats to be distributed among counties the populations of which ranged from 15,420 to 942,292.[37] With seven more counties having populations over 100,000 and 13 others having populations over 50,000,[38] the disproportion in the Assembly was necessarily large. In Vermont, after each county had been allocated one Senator, there were 16 seats remaining to be distributed among the larger counties.[39] The smallest county had a population of 4,082; the largest had a population of 40,651 and there were 10 other counties with populations over 20,000.[40]
(iii) Ratification by the “reconstructed” States.- — ■ Each of the 10 “reconstructed” States was required to ratify the Fourteenth Amendment before it was readmitted to the Union.[41] The Constitution of each was scrutinized in Congress.[42] Debates over readmission *737 were extensive.[43] In at least one instance, the problem of state legislative apportionment was expressly called to the attention of Congress. Objecting to the inclusion of Florida in the Act of June 25, 1868, Mr. Farnsworth stated on the floor of the House:
“I might refer to the apportionment of representatives. By this constitution representatives in the Legislature of Florida are apportioned in such a manner as to give to the sparsely-populated portions of the State the control of the Legislature. The sparsely-populated parts of the State are those where there are very few negroes, the parts inhabited by the white rebels, the men who, coming in from Georgia, Alabama, and other States, control the fortunes of their several counties. By this constitution every county in that State is entitled to a representative. There are in that State counties that have not thirty registered voters; yet, under this constitution, every one of those counties is entitled *738 to a representative in the Legislature; while the populous counties are entitled to only one representative each, with an additional representative for every thousand inhabitants.”[44]
The response of Mr. Butler is particularly illuminating:
“All these arguments, all these statements, all the provisions of this constitution have been submitted to the Judiciary Committee of the Senate, and they have found the constitution republican and proper. This constitution has been submitted to the Senate, and they have found it republican and proper. It has been submitted to your own Committee on Reconstruction, and they have found it republican and proper, and have reported it to this House.” [45]
The Constitutions of six of the 10-States contained provisions departing substantially from the method of apportionment now held to be required by the Amendment.[46] And, as in the North, the departures were as real in fact as in theory. In North Carolina, 90 of the 120 representatives were apportioned among the counties without regard to population, leaving 30 seats to be distributed by numbers.[47] Since there were seven counties with populations under 5,000 and 26 counties with populations over 15,000, the disproportions must have been widespread and substantial.[48] In South Carolina, Charleston, with a population of 88,863, elected two Senators; each of the other counties, with populations ranging from 10,269 to *739 42,486, elected one Senator.[49] In Florida, each of the 39 counties was entitled to elect one Representative; no county was entitled to more than four.[50] These principles applied to Dade County, with a population of 85, and to Alachua County and Leon County, with populations of 17,328 and 15,236, respectively.[51]
It is incredible that Congress would have exacted ratification of the Fourteenth Amendment as thé price of readmission, would have studied the State Constitutions for compliance with the Amendment, and would then have disregarded violations of it. •
The facts recited above show beyond any possible doubt:
(1) that Congress, with full awareness of and attention to the possibility that the States would not afford full equality in voting rights to all their citizens, nevertheless deliberately chose not to interfere with the States’ plenary power in this regard when it proposed the Fourteenth Amendment;
(2) that Congress did not include in the Fourteenth Amendment restrictions on the States’ power to control voting rights because it believed that if such restrictions were included, the Amendment would not be adopted; and
(3) that at least a substantial majority, if not all, of the States which ratified the Fourteenth Amendment did not consider that in so doing, they were accepting limitations on their freedom, never before questioned, to regulate voting rights as they chose.
Even if one were to accept the majority’s belief that it is proper entirely to disregard the unmistakable implica *740 tions of the second section of the Amendment in construing the first section, one is confounded by its disregard of all this history. There is here none of the difficulty which may attend the application of basic principles to situations not contemplated or understood when the principles were framed. The problems which concern the Court now were problems when the Amendment was adopted. By the deliberate choice of those responsible for the Amendment, it left those problems untouched.
C. After 1868.
The years following 1868, far from indicating a developing awareness of the applicability of the Fourteenth Amendment to problems of apportionment, demonstrate precisely the reverse: that the States retained and exercised the power independently to apportion their legislatures. In its Constitutions of 1875 and 1901, Alabama carried forward earlier provisions guaranteeing each county at least one representative and fixing an upper limit to the number of seats in the House.[52] Florida’s Constitution of 1885 continued the guarantee of one representative for each county and reduced the maximum number of representatives per county from four to three.[53] Georgia, in 1877, continued to favor the smaller counties.[54] Louisiana, in 1879, guaranteed each parish at least one representative in the House.[55] In 1890, Mississippi guaranteed each county one representative, established a maximum number of representatives, and provided that specified groups of counties should each have approximately one-third of the seats in the House, what *741 ever the spread of population.[56] Missouri’s Constitution of 1875 gave each county one representative and otherwise favored less populous areas.[57] Montana’s original Constitution of 1889 apportioned the State Senate by counties.[58] In 1877, New Hampshire amended its Constitution’s provisions for apportionment, but continued to favor sparsely settled areas in the House and to apportion seats in the Senate according to direct taxes paid;[59] the same was true of New Hampshire’s Constitution of 1902.[60]
In 1894, New York adopted a Constitution the peculiar apportionment provisions of which were obviously intended to prevent representation according to population: no county was allowed to have more than one-third of all the Senators, no two counties which were adjoining or “separated only by public waters” could have more than one-half of all the Senators, and whenever any county became entitled to more than three Senators, the total number of Senators was increased, thus preserving to the small counties their original number of seats.[61] In addition, each county except Hamilton was guaranteed a seat in the Assembly.[62] The North Carolina Constitution of 1876 gave each county at least one representative and fixed a maximum number of representatives for the whole House.[63] Oklahoma’s Constitution at the time of its admission to the Union (1907) favored small counties by the use of partial ratios and a maximum number of seats in the House; in addition, no county was permitted to “take part” in the election of more than seven *742 representatives.[64] Pennsylvania, in 1873, continued to guarantee each county one representative in the House.[65] The same was true of South Carolina’s Constitution of 1895, which provided also that each county should elect one and only one Senator.[66] Utah’s original Constitution of 1895 assured each county of one representative in the House.[67] Wyoming, when it entered the Union in 1889, guaranteed each county at least one Senator and one representative.[68]
D. Today.
Since the Court now invalidates the legislative appor-tionments in six States, and has so far upheld the apportionment in none, it is scarcely necessary to comment on the situation in the States today, which is, of course, as fully contrary to the Court’s decision as is the record of every prior period in this Nation’s history. As of 1961, the Constitutions of all but 11 States, roughly 20% of the total, recognized bases of apportionment other than geographic spread of population, and to some extent favored sparsely populated areas by a variety of devices, ranging from straight area representation or guaranteed minimum area representation to complicated schemes of the kind exemplified by the provisions of New York’s Constitution of 1894, still in effect until struck down by the Court today in No. 20, post, p. 633.[69] Since *743 Tennessee, which was the subject of Baker v. Carr, and Virginia, scrutinized and disapproved today in No. 69, post, p. 678, are among the 11 States whose own Constitutions are sound from the standpoint of the Federal Constitution as construed today, it is evident that the actual practice of the States is even more uniformly than their theory opposed to the Court’s view of what is constitutionally permissible.
E. Other Factors.
In this summary of what the majority ignores, note should be taken of the Fifteenth and Nineteenth Amendments. The former prohibited the States from denying or abridging the right to vote “on account of race, color, or previous condition of servitude.” The latter, certified as part of the Constitution in 1920, added sex to the prohibited classifications. In Minor v. Happersett, 21 Wall. 162, this Court considered the claim that the right of women to vote was protected by the Privileges and Immunities Clause of the Fourteenth Amendment. The Court’s discussion there of the significance of the Fifteenth Amendment is fully applicable here with respect to the Nineteenth Amendment as well.
“And still again, after the adoption of the fourteenth amendment, it was deemed necessary to adopt a fifteenth, as follows: 'The right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any State, on account of race, color, or previous condition of servitude.’ The fourteenth amendment had already provided that no State should make or enforce any law which should abridge the privileges or immunities of citizens of the United States. If suffrage was one of these privileges or immunities, why amend the Constitution to prevent its being denied on account of race, &c.? Nothing is more evident than that the greater must *744 include the less, and if all were already protected why go through with the form of amending the Constitution to protect a part?” Id., at 175.
In the present case, we can go still further. If constitutional amendment was the only means by which all men and, later, women, could be guaranteed the right to vote at all, even for federal officers, how can it be that the far less obvious right to a particular kind of apportionment of state legislatures — a right to which is opposed a far more plausible conflicting interest of the State than the interest which opposes the general right to vote — can be conferred by judicial construction of the Fourteenth Amendment? [70] Yet, unless one takes the highly implausible view that the Fourteenth Amendment controls methods of apportionment but leaves the right to vote itself unprotected, the conclusion is inescapable that the Court has, for purposes of these cases, relegated the Fifteenth and Nineteenth Amendments to the same limbo of constitutional anachronisms to which the second section of the Fourteenth Amendment has been assigned.
Mention should be made finally of the decisions of this Court which are disregarded or, more accurately, silently overruled today. Minor v. Happersett, supra, in which the Court held that the Fourteenth Amendment did not *745 confer the right to vote on anyone, has already been noted. Other cases are more directly in point. In Colegrove v. Barrett, 330 U. S. 804, this Court dismissed “for want of a substantial federal question” an appeal from the dismissal of a complaint alleging that the Illinois legislative apportionment resulted in “gross inequality in voting power” and “gross and arbitrary and atrocious discrimination in voting” which denied the plaintiffs equal protection of the laws.[71] In Remmey v. Smith, 102 F. Supp. 708 (D. C. E. D. Pa.), a three-judge District Court dismissed a complaint alleging that the apportionment of the Pennsylvania Legislature deprived the plaintiffs of “constitutional rights guaranteed to them by the Fourteenth Amendment.” Id., at 709. The District Court stated that it was aware that the plaintiffs’ allegations were “notoriously true” and that “the practical disenfranchisement of qualified electors in certain of the election districts in Philadelphia County is a matter of common knowledge.” Id., at 710. This Court dismissed the appeal “for the want of a substantial federal question.” 342 U. S.916.
In Kidd v. McCanless, 200 Tenn. 273, 292 S. W. 2d 40, the Supreme Court of Tennessee dismissed an action for a declaratory judgment that the Tennessee Apportionment Act of 1901 was unconstitutional. The complaint alleged that “a minority of approximately 37% of the voting population of the State now elects and controls 20 of the 33 members of the Senate; that a minority of 40% of the voting population of the State flow controls 63 of the 99 members of the House of Representatives.” Id., at 276, 292 S. W. 2d, at 42. Without dissent, this Court granted the motion to dismiss the appeal. 352 U. S. 920. In Radford v. Gary, 145 F. Supp. 541 (D. C. W. D. Okla.), a three-judge District Court was *746 convened to consider “the complaint of the plaintiff to the effect that the existing apportionment statutes of the State of Oklahoma violate the plain mandate of the Oklahoma Constitution and operate to deprive him of the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States.” Id., at 542. The plaintiff alleged that he was a resident and voter in the most populous county of the State, which had about 15% of the total population of the State but only about 2% of the seats in the State Senate and less than 4% of the seats in the House. The complaint recited the unwillingness or inability of the branches of the state government to provide relief and alleged that there was no state remedy available. The District Court granted a motion to dismiss. This Court affirmed without dissent. 352 U. S. 991.
Each of these recent cases is distinguished on some ground or other in Baker v. Carr. See 369 U. S., at 235-236. Their summary dispositions prevent consideration whether these after-the-fact distinctions are real or imaginary. The fact remains, however, that between 1947 and 1957, four cases raising issues precisely the same as those decided today were presented to the Court. Three were dismissed because the issues presented were thought insubstantial and in the fourth the lower court’s dismissal was affirmed.[72]
I have tried to make the catalogue complete, yet to keep it within the manageable limits of a judicial opinion. In my judgment, today’s decisions are refuted by *747 the language of the Amendment which they construe and by the inference fairly to be drawn from subsequently enacted Amendments. They are unequivocally refuted by history and by consistent theory and practice from the time of the adoption of the Fourteenth Amendment until today.
II.
The Court’s elaboration of its new “constitutional” doctrine indicates how far — and how unwisely — it has strayed from the appropriate bounds of its authority. The consequence of today’s decision is that in all but the handful of States which may already satisfy the new requirements the local District Court or, it may be, the state courts, are given blanket authority and the constitutional duty to supervise apportionment of the State Legislatures. It is difficult to imagine a more intolerable and inappropriate interference by the judiciary with the independent legislatures of the States.
In the Alabama cases (Nos. 23, 27, 41), the District Court held invalid not only existing provisions of the State Constitution — which this Court lightly dismisses with a wave of the Supremacy Clause and the remark *748 that “it makes no difference whether a State’s apportionment scheme is embodied in its constitution or in statutory provisions,” ante, p. 584 — but also a proposed amendment to the Alabama Constitution which had never been submitted to the voters of Alabama for ratification, and “standby” legislation which was not to become effective unless the amendment was rejected (or declared unconstitutional) and in no event before 1966. Sims v. Frink, 208 F. Supp. 431. See ante, pp. 543-551. Both of these measures had been adopted only nine days before,[73] at an Extraordinary Session of the Alabama Legislature, convened pursuant to what was very nearly a directive of the District Court, see Sims v. Frink, 205 F. Supp. 245, 248. The District Court formulated its own plan for the apportionment of the Alabama Legislature, by picking and choosing among the provisions of the -legislative measures. 208 F. Supp., at 441-442. See ante, p. 552. Beyond that, the court warned the legislature that there would be still further judicial reapportionment unless the legislature, like it or not, undertook the task for itself. 208 F. Supp., at 442. This Court now states that the District Court acted in “a most proper and commendable manner,” ante, p. 586, and approves the District Court’s avowed intention of taking “some further action” unless the State Legislature acts by 1966, ante, p. 587.
In the Maryland case (No. 29, post, p. 656), the State Legislature was called into Special Session and enacted a temporary reapportionment of the House of Delegates, under pressure from the state courts.[74] Thereafter, the *749 Maryland Court of Appeals held that the Maryland Senate was constitutionally apportioned. Maryland Committee for Fair Representation v. Tawes, 229 Md. 406, 184 A. 2d 715. This Court now holds that neither branch of the State Legislature meets constitutional requirements. Post, p. 674. The Court presumes that since “the Maryland constitutional provisions relating to legislative apportionment [are] hereby held unconstitutional, the Maryland Legislature . . . has the inherent power to enact at least temporary reapportionment legislation pending adoption of state constitutional provisions” which satisfy the Federal Constitution, id., at 675. On this premise, the Court concludes that the Maryland courts need not “feel obliged to take further affirmative action” now, but that “under no circumstances should the 1966 election of members of the Maryland Legislature be permitted to be conducted pursuant to the existing or any other unconstitutional plan.” Id., at 676.
In the Virginia case (No. 69, post, p. 678), the State Legislature in 1962 complied with the state constitutional requirement of regular reapportionment.[75] Two days later, a complaint was filed in the District Court.[76] Eight months later, the legislative reapportionment was *750 declared unconstitutional. Mann v. Davis, 213 F. Supp. 577. The District Court gave the State Legislature two months within which to reapportion itself in special session, under penalty of being reapportioned by the court.[77] Only a stay granted by a member of this Court slowed the process;[78] it is plain that no stay will be forthcoming in the future. The Virginia Legislature is to be given “an adequate opportunity to enact a valid plan”; but if it fails “to act promptly in remedying the constitutional defects in the State’s legislative apportionment plan,” the District Court is to “take further action.” Post, p. 693.
In Delaware (No. 307, post, p. 695), the District Court entered an order on July 25, 1962, which stayed proceedings until August 7, 1962, “in the hope and expectation” that the General Assembly would take “some appropriate action” in the intervening 13 days. Sincock v. Terry, 207 F. Supp. 205, 207. By way of prodding, presumably, the court noted that if no legislative action were taken and the court sustained the plaintiffs’ claim, “the present General Assembly and any subsequent General Assembly, the members of which were elected pursuant to Section 2 of Article 2 [the challenged provisions of the Delaware Constitution], might be held not to be a de jure legislature and its legislative acts might be held invalid and unconstitutional.” Id., at 205-206. Five days later, on July 30, 1962, the General Assembly approved a proposed amendment to the State Constitution. On August 7, 1962, the District Court entered an order denying the *751 defendants’ motion to dismiss. The court said that it did not wish to substitute its judgment “for the collective wisdom of the General Assembly of Delaware,” but that “in the light of all the circumstances,” it had to proceed promptly. 210 F. Supp. 395, 396. On October 16, 1962, the court declined to enjoin the conduct of elections in November. 210 F. Supp. 396. The court went on to express its regret that the General Assembly had not adopted the court’s suggestion, see 207 F. Supp., at 206-207, that the Delaware Constitution be amended to make apportionment a statutory rather than a constitutional matter, so as to facilitate further changes in apportionment which might be required. 210 F. Supp., at 401. In January 1963, the General Assembly again approved the proposed amendment of the apportionment provisions of the Delaware Constitution, which thereby became effective on January 17,1963.[79] Three months later, on April 17, 1963, the District Court reached “the reluctant conclusion” that Art. II, § 2, of the Delaware Constitution was unconstitutional, with or without the 1963 amendment. Sincock v. Duffy, 215 F. Supp. 169, 189. Observing that “the State of Delaware, the General Assembly, and this court all seem to be trapped in a kind of box of time,” id., at 191, the court gave the General Assembly until October 1, 1963, to adopt acceptable pro-visons for apportionment. On May 20, 1963, the District Court enjoined the defendants from conducting any elections, including the general election scheduled for November 1964, pursuant to the old or the new constitutional provisions.[80] This Court now approves all these *752 proceedings, noting particularly that in allowing the 1962 elections to go forward, “the District Court acted in a wise and temperate manner.” Post, p. 710.[81]
Records such as these in the cases decided today are sure to be duplicated in most of the other States if they have not been already. They present a jarring picture of courts threatening to take action in an area which they have no business entering, inevitably on the basis of political judgments which they are incompetent to make. They show legislatures of' the States meeting in haste and deliberating and deciding in haste to avoid the threat of judicial interference.- So far as I can tell, the Court’s only response to this unseemly state of affairs is ponderous insistence that “a denial of constitutionally protected rights demands judicial protection,” ante, p. 566. By thus refusing to recognize the bearing which a potential for *753 conflict of this kind may have on the question whether the claimed rights are in fact constitutionally entitled to judicial protection, the Court assumes, rather than supports, its conclusion.
It should by now be obvious that these cases do not mark the end of reapportionment problems in the courts. Predictions once made that the courts would never have to face the problem of actually working out an apportionment have proved false. This Court, however, continues to avoid the consequences of its decisions, simply assuring us that the lower courts “can and . . . will work out more concrete and specific standards,” ante, p. 578. Deeming it “expedient” not to spell out “precise constitutional tests,” the Court contents itself with stating “only a few rather general considerations.” Ibid.
Generalities cannot obscure the cold truth that cases of this type are not amenable to the development of judicial standards. No set of standards can guide a court which has to decide how many legislative districts a State shall have, or what the shape of the districts shall be, or where to draw a particular district line. No judicially manageable standard can determine whether a State should have single-member districts or multimember districts or some combination of both. No such standard can control the balance between keeping up with population shifts and having stable districts. In all these respects, the courts will be called upon to make particular decisions with respect to which a principle of equally populated districts will be of no assistance whatsoever. Quite obviously, there are limitless possibilities for dis-tricting consistent with such a principle. Nor can these problems be avoided by judicial reliance on legislative judgments so far as possible. Reshaping or combining one or two districts, or modifying just a few district lines, is no less a matter of choosing among many possible *754 solutions, with varying political consequences, than reapportionment broadside.[82]
The Court ignores all this, saying only that “what is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case,” ante, p. 578. It is well to remember that the product of today’s decisions will not be readjustment of a few districts in a few States which most glaringly depart from the principle of equally populated districts. It will be a redetermination, extensive in many cases, of legislative districts in all but a few States.
Although the Court — necessarily, as I believe — provides only generalities in elaboration of its main thesis, its opinion nevertheless fully demonstrates how far removed these problems are from fields of judicial competence. Recognizing that “indiscriminate districting” is an invitation to “partisan gerrymandering,” ante, pp. 578-579, the Court nevertheless excludes virtually every basis for the formation of electoral districts other than “indiscriminate districting.” In one or another of today’s opinions, the Court declares it unconstitutional for a State to give effective consideration to any of the following in establishing legislative districts:
(1) history;[83]
(2) “economic or other sorts of group interests”; [84]
(3) area;[85]
(4) geographical considerations;[86]
(5) a desire “to insure effective representation for sparsely settled areas”;[87]
*755 (6) “availability of access of citizens to their representatives”; [88]
(7) theories of bicameralism (except those approved by the Court);[89]
(8) occupation;[90]
(9) “an attempt to balance urban and rural power.” [91]
(10) the preference of a majority of voters in the State.[92]
So far as presently appears, the only factor which a State may consider, apart from numbers, is political subdivisions. But even “a clearly rational state policy” recognizing this factor is unconstitutional if “population is submerged as the controlling consideration . . . .” [93]
I know of no principle of logic or practical or theoretical politics, still less any constitutional principle, which establishes all or any of these exclusions. Certain it is that the Court’s opinion does not establish them. So far as the Court says anything at all on this score, it says only that “legislators represent people, not trees or acres,” ante, p. 562; that “citizens, not history or economic interests, cast votes,” ante, p. 580; that “people, not land or trees or pastures, vote,” ibid.[94] All this may be conceded. But it is surely equally obvious, and, in the context of elections, more meaningful to note that people are not ciphers and that legislators can represent their electors only by speak *756 ing for their interests — economic, social, political — many of which do reflect the place where the electors live. The Court does not establish, or indeed even attempt to make a case for the proposition that conflicting interests within a State can only be adjusted by disregarding them when voters are grouped for purposes of representation.
Conclusion.
With these cases the Court approaches the end of the third round set in motion by the complaint filed in Baker v. Carr. What is done today deepens my conviction that judicial entry into this realm is profoundly ill-advised and constitutionally impermissible. As I have said before, Wesberry v. Sanders, supra, at 48, I believe that the vitality of our political system, on which in the last analysis all else depends, is weakened by reliance on the judiciary for political reform; in time a complacent body politic may result.
These decisions also cut deeply into the fabric of our federalism. What must follow from them may eventually appear to be the product of state legislatures. Nevertheless, no thinking person can fail to recognize that the aftermath of these cases, however desirable it may be thought in itself, will have been achieved at the cost of a radical alteration in the relationship between the States and the Federal Government, more particularly the Federal Judiciary. Only one who has an overbearing impatience with the federal system and its political processes will believe that that cost was not too high or was inevitable.
Finally, these decisions give support to a current mis*-taken view of the Constitution and the constitutional function of this Court. This view, in a nutshell, is that every major social ill in this country can find its cure in some constitutional “principle,” and that this Court should “take the lead” in promoting reform when other branches of government fail to act. The Constitution is *757 not a panacea for every blot upon the public welfare, nor should this Court, ordained as a judicial body, be thought of as a general haven for reform movements. The Constitution is an instrument of government, fundamental to which is the premise that in a diffusion of governmental authority lies the greatest promise that this Nation will realize liberty for all its citizens. This Court, limited in function in accordance with that premise, does not serve its high purpose when it exceeds its authority, even to satisfy justified impatience with the slow workings of the political process. For when, in the name of constitutional interpretation, the Court adds something to the Constitution that was deliberately excluded from it, the Court m reality substitutes its view of what should be so for the amending process.
I dissent in each of these cases, believing that in none of them have the plaintiffs stated a cause of action. To the extent that Baker v. Carr, expressly or by implication, went beyond a discussion of jurisdictional doctrines independent of the substantive issues involved here, it should be limited to what it in fact was: an experiment in venturesome constitutionalism. I would reverse the judgments of the District Courts in Nos. 23, 27, and 41 (Alabama), No. 69 (Virginia), and No. 307 (Delaware), and remand with directions to dismiss the complaints. I would affirm the judgments of the District Courts in No. 20 (New York), and No. 508 (Colorado), and of the Court of Appeals of Maryland in No. 29.
APPENDIX A TO OPINION OF MR. JUSTICE HARLAN, DISSENTING.
Statements made in the House of Representatives during the debate on the resolution proposing the Fourteenth Amendment.*
*758 “As the nearest approach to justice which we are likely to be able to make, I approve of the second section that bases representation upon voters.” 2463 (Mr. Garfield).
“Would it not be a most unprecedented thing that when this [former slave] population are not permitted where they reside to enter into the basis of representation in their own State, we should receive it as an element of representation here; that when they will not count them in apportioning their own legislative districts, we are to count them as five fifths (no longer as three fifths, for that is out of the question) as soon as you make a new apportionment?” 2464-2465 (Mr. Thayer).
“The second section of the amendment is ostensibly intended to remedy a supposed inequality in the basis of representation. The real object is to reduce the number of southern representatives in Congress and in the Electoral College; and also to operate as a standing inducement to negro suffrage.” 2467 (Mr. Boyer).
“Shall the pardoned rebels of the South include in the basis of representation four million people to whom they deny political rights, and to no one of whom is allowed a vote in the selection of a Representative?” 2468 (Mr. Kelley).
“I shall, Mr. Speaker, vote for this amendment; not because I approve it. Could I have controlled the report of the committee of fifteen, it would have proposed to give the right of suffrage to every loyal man in the country.” 2469 (Mr. Kelley).
“But I will ask, why should not the representation of the States be limited as the States themselves limit suffrage? ... If the negroes of the South are *759 not to be counted as a political element in the government of the South in the States, why should they be counted as a political element in the government of the country in the Union?” 2498 (Mr. Broomall).
“It is now proposed to base representation upon suffrage, upon the number of voters, instead of upon the aggregate population in every State of the Union.” 2502 (Mr. Raymond).
“We admit equality of representation based upon the exercise of the elective franchise by the people. The proposition in the matter of suffrage falls short of what I desire, but so far as it goes it tends to the equalization of the inequality at present existing; and while I demand and shall continue to demand the franchise for all loyal male citizens of this country — and I cannot but admit the possibility that ultimately those eleven States may be restored to representative power without the right of franchise being conferred upon the colored people — I should feel myself doubly humiliated and disgraced, and criminal even, if I hesitated to do what I can for a proposition which equalizes representation.” 2508 (Mr. Boutwell).
“Now, conceding to each State the right to regulate the right of suffrage, they ought not to have a representation for male citizens not less than twenty-one years of age, whether white or black, who are deprived of the exercise of suffrage. This amendment will settle the complication in regard to suffrage and representation, leaving each State to regulate that for itself, so that it will be for it to decide whether or not it shall have a representation for all its male citizens not less than twenty-one years of age.” 2510 (Mr. Miller).
*760 “Manifestly no State should have its basis of national representation enlarged by reason of a portion of citizens within its borders to which the elective franchise is denied. If political power shall be lost because of such denial, not imposed because of participation in rebellion or other crime, it is to be hoped that political interests may work in the line of justice, and that the end will be the impartial enfranchisement of all citizens not disqualified by crime. Whether that end shall be attained or not, this will be secured: that the measure of political power of any State shall be determined by that portion of its citizens which can speak and act at the polls, and shall not be enlarged because of the residence within the State of portions of its citizens denied the right of franchise. So much for the second section of the amendment. It is not all that I wish and would demand; but odious inequalities are removed by it and representation will be equalized, and the political rights of all citizens will under its operation be, as we believe, ultimately recognized and admitted.” 2511 (Mr. Eliot).
“I have no doubt that the Government of the United States has full power to extend the elective franchise to the colored population of the insurgent States. I mean authority; I said power. I have no doubt that the Government of the United States has authority to do this under the Constitution; but I do not think they have the power. The distinction I make between authority and power is this: we have, in the nature of our Government, the right to do it; but the public opinion of the country is such at this precise moment as to make it impossible we should do it. It was therefore most wise on the part of the committee on reconstruction to waive this matter in deference to public opinion. The sitúa *761 tion of opinion in these States compels us to look to other means to protect the Government against the enemy.” 2532 (Mr. Banks).
“If you deny to any portion of the loyal citizens of your State the right to vote for Representatives you shall not assume to represent them, and, as you have done for so long a time, misrepresent and oppress them. This is a step in the right direction; and although I should prefer to see incorporated into the Constitution a guarantee of universal suffrage, as we cannot get the required two thirds for that, I cordially support this proposition as the next best.” 2539-2540 (Mr. Farnsworth).
APPENDIX B TO OPINION OF MR. JUSTICE HARLAN, DISSENTING.
Statements made in the Senate during the debate on the resolution proposing the Fourteenth Amendment.*
“The second section of the constitutional amendment proposed by the committee can be justified upon no other theory than that the negroes ought to vote; and negro suffrage must be vindicated before the people in sustaining that section, for it does not exclude the non-voting population of the North, because it is admitted that there is no wrong in excluding from suffrage aliens, females, and minors. But we say, if the negro is excluded from suffrage he shall also be excluded from the basis of representation. Why this inequality? "Why this injustice? For injustice it would be unless there be some good reason for this discrimination against the South in excluding her non-voting population from the basis *762 of representation. The only defense that we can make to this apparent injustice is that the South commits .an outrage upon human rights when she denies the ballot to the blacks, and we will not allow her to take advantage of her own wrong, or profit by this outrage. Does any one suppose it possible to avoid this plain issue before the people? For if they will sustain you in reducing the representation of the South because she does not allow the negro to vote, they will do so because they think it is wrong to disfranchise him.” 2800 (Senator Stewart).
“It [the second section of the proposed amendment] relieves him [the Negro] from misrepresentation in Congress by denying him any representation whatever.” 2801 (Senator Stewart):
“But I will again venture the opinion that it [the second section] means as if it read thus: no State shall be allowed a representation on a colored population unless the right of voting is given to the negroes — presenting to the States the alternative of loss of representation or the enfranchisement of the negroes, and their political equality.” 2939 (Senator Hendricks).
“I should be much better satisfied if the right of suffrage had been given at once to the more intelligent of them [the Negroes] and such as had served in our Army. But it is believed by wiser ones than myself that this amendment will very soon produce some grant of suffrage to them, and that the craving for political power will ere long give them universal suffrage. . . . Believing that this amendment probably goes as far in favor of suffrage to the negro as is practicable to accomplish now, and hoping it may in *763 the end accomplish all I desire in this respect, I shall vote for its adoption, although I should be glad to go further.” 2963-2964 (Senator Poland).
“What is to be the operation of this amendment? Just this: your whip is held over Pennsylvania, and you say to her that she must either allow her negroes to vote or have one member of Congress less.” 2987 (Senator Cowan).
“Now, sir, in all the States — certainly in mine, and no doubt in all — there are local as contradistinguished from State elections. There are city elections, county elections, and district or borough elections; and those city and county and district elections are held under some law of the State in which the city or county or district or borough may be; and in those elections, according to the laws of the States, certain qualifications are prescribed, residence within the limits of the locality and a property qualification in some. Now, is it proposed to say that if every man in a State is not. at liberty to vote at a city or a country or a borough election that is to affect the basis of representation?” 2991 (Senator Johnson).
“Again, Mr. President, the measure upon the table, like the first proposition submitted to the Senate from the committee of fifteen, concedes to the States . . . not only the right, but the exclusive right, to regulate the franchise. ... It says that each of the southern States, and, of course, each other State in the Union, has a right to regulate for itself the franchise, and that consequently, as far as the Government of the United States is concerned, if the black man is not permitted the right to the franchise, it will be a wrong (if a wrong) which the Govern *764 ment of the United States will be impotent to redress.” 3027 (Senator Johnson).
“The amendment fixes representation upon numbers, precisely as the Constitution now does, but when a State denies or abridges the elective franchise to any of its male inhabitants who are citizens of the United States and not less than twenty-one years of age, except for participation in rebellion or other crime, then such State will lose its representation in Congress in the proportion which the male citizen so excluded bears to the whole number of male citizens not less than twenty-one years of age in the State.” 3033 (Senator Henderson).

[This opinion applies also to No. 20, WMCA, Inc., et al. v. Lomenzo, Secretary of State of New York, et al., post, p. 633; No. 29, Maryland Committee for Fair Representation et al. v. Tawes, Governor, et al., post, p. 656; No. 69, Davis, Secretary, State Board of Elections, et al. v. Mann et al., post, p. 678; No. 307, Roman, Clerk, et al. v. Sincock et al., post, p. 695; and No. 508, Lucas et al. v. Forty-Fourth General Assembly of Colorado et al., post, p. 713.]

 Alabama, Colorado, Delaware, Maryland, New York, Virginia.

 In the Virginia case, Davis v. Mann, post, p. 678, the defendants introduced an exhibit prepared by the staff of the Bureau of Public Administration of the University of Virginia in which the Virginia Legislature, now held to be unconstitutionally apportioned, was ranked eighth among the 50 States in “representativeness,” with population taken as the basis of representation. The Court notes that before the end of 1962, litigation attacking the apportionment of state legislatures had been instituted in at least 34 States. Ante, p. 556, note 30. See infra, pp. 610-611.

 See Baker v. Carr, 369 U. S. 186, 330, and the dissenting opinion of Frankfurter, J., in which I joined, id., at 266; Gray v. Sanders, 372 U. S. 368, 382; Wesberry v. Sanders, 376 U. S. 1, 20.

 That clause, which manifestly has no bearing on the claims made in these eases, see V Elliot’s Debates on the Adoption of the Federal Constitution (1845), 332-333, could not in any event be the foundation for judicial relief. Luther v. Borden, 7 How. 1, 42-44; Ohio ex rel. Bryant v. Akron Metropolitan Park District, 281 U. S. 74, 79-80; Highland Farms Dairy, Inc., v. Agnew, 300 U. S. 608, 612. In Baker v. Carr, supra, at 227, the Court stated that reliance on the Republican Form of Government Clause “would be futile.”

 It is fair to say that, beyond discussion of a large number of cases having no relevance to this question, the Court’s views on this subject were fully stated in the compass of a single sentence: “Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action.” 369 U. S., at 226.
Except perhaps for the “crazy quilt” doctrine of my Brother Clark, 369 IT. S., at 251, nothing is added to this by any of the concurring opinions, id,., at 241, 265.

 The cryptic remands in Scholle v. Hare, 369 U. S. 429, and WMCA, Inc., v. Simon, 370 U. S. 190, on the authority of Baker, had nothing to say on the question now before the Court.

 See the Journal of the Committee, reprinted in Kendrick, The Journal of the Joint Committee of Fifteen on Reconstruction (1914), 83-117.

 See the debates in Congress, Cong. Globe, 39th Cong., 1st Sess., 2459-3149, passim (1866) (hereafter Globe).

 Globe 3040.

 Globe 2265, 2286.

 As reported in the House. Globe 2286. For prior versions of the Amendment in the Reconstruction Committee, see Kendrick, op. cit., supra, note 7, 83-117. The work of the Reconstruction Committee is discussed in Kendrick, supra, and Flack, The Adoption of the Fourteenth Amendment (1908), 55-139, passim.

 Globe 2459.

 Ibid. Stevens was referring to a proposed amendment to the Constitution which provided that “whenever the elective franchise shall be denied or abridged in any State on account of race or color, all persons therein of such race or color shall be excluded from the basis of representation.” Globe 535. It passed the House, id., at 538, but did not muster the necessary two-thirds vote in the Senate, id., at 1289.

 Globe 2459.

 Ibid.

 Ibid.

 Ibid.

 Globe 2460.

 Kendrick, op. tit., supra, note 7, 87, 106; Flack, op. cit., supra, note 11, 60-68, 71.

 Globe 2542.

 Ibid. It is evident from the context of the reference to a republican government that Bingham did not regard limitations on the right to vote or the denial of the vote to specified categories of individuals as violating the guarantee of a republican form of government.

 Ibid.

 Representative Rogers, who voted against the resolution, Globe 2545, suggested that the right to vote might be covered by the Privileges and Immunities Clause. Globe 2538. But immediately thereafter he discussed the possibility that the Southern States might “refuse to allow the negroes to vote.” Ibid.

 Globe 2545.

 Globe 2766.

 Ibid.

 Ibid.

 Globe 3042.

 Globe 3149.

 Such evidence as there is, mostly committee reports and messages to the legislatures from Governors of the States, is to the same effect as the evidence from the debates in the Congress. See Ark. House J. 288 (1866-1867); Fla. Sen. J. 8-10 (1866); Ind. House J. 47-48, 50-51 (1867); Mass. Legis. Doc., House Doc. No. 149, 4r-14, 16-17, 23, 24, 25-26 (1867); Mo. Sen. J. 14 (1867); N. J. Sen. J. 7 (Extra Sess. ¿866); N. C. Sen. J. 96-97, 98-99 (1866-1867); Tenn. House J. 12-15 (1865-1866); Tenn. Sen. J. 8 (Extra Sess. 1866); Va. House J. & Doc., Doc. No. 1, 35 (1866-1867); Wis. Sen. J. 33, 101-103 (1867). Contra: S. C. House J. 34 (1866); Tex. Sen. J. 422 (1866 App.).
For an account of the proceedings in the state legislatures and citations to the proceedings, see Fairman, “Does the Fourteenth Amendment Incorporate the Bill of Rights?” 2 Stan. L. Rev. 5, 81-126 (1949).

 Conn. Const., 1818, Art. Third, § 3 (towns); N. H. Const., 1792, Part Second, § XXVI (direct taxes paid); N. J. Const., 1844, Art. IV, § II, cl. 1 (counties); R. I. Const., 1842, Art. VI, § 1 (towns and cities); Vt. Const., 1793, c. II, § 7 (towns).
In none of these States was the other House apportioned strictly according to population. Conn. Const., 1818, Amend. II; N. H. Const., 1792, Part Second, §§ IX-XI; N. J. Const., 1844, Art. IV, *735 § III, cl. 1; R. I. Const., 1842, Art. Y, § 1; Vt. Const., 1793, Amend. 23.

 Iowa Const., 1857, Art. Ill, §35; Kan. Const., 1859, Art. 2, §2, Art. 10, §1; Me. Const., 1819, Art. IV-Part First, §3; Mich. Const., 1850, Art. IV, §3; Mo. Const., 1865, Art. IV, §2; N. Y. Const., 1846, Art. Ill, §5-; Ohio Const., 1851, Art. XI, §§2-5; Pa. Const., 1838, Art. I, §§ 4, 6, 7, as amended; Tenn. Const., 1834, Art. II, § 5; W. Va. Const., 1861-1863, Art. IV, § 9.

 Ninth Census of the United States, Statistics of Population (1872) (hereafter Census), 49. The population figures, here and hereafter, are for the year 1870, which presumably best reflect the figures for the years 1866-1870. Only the figures for 1860 were available at that time, of course, and they would have been used by anyone interested in population statistics. See, e. g., Globe 3028 (remarks of Senator Johnson).
The method of apportionment is contained in N. J. Const., 1844, Art. IV, §11, cl. 1.

 N. J. Const., 1844, Art. IV. § III, cl. 1. Census 49.

 Ibid.

 N. Y. Const., 1846, Art. Ill, §§ 2, 5. Census 50-51.

 Ibid.

 Ibid.

 There were 14 counties, Census 67, each of which was entitled to at least one out of a total of 30 seats. Vt. Const., 1793, Amend. 23.

 Census 67.

 Act of Mar. 2, 1867, §5, 14 Stat. 429. See also Act of June 25, 1868, 15 Stat. 73, declaring that the States of North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida, would be admitted to representation in Congress when their legislatures had ratified the Fourteenth Amendment. Other conditions were also imposed, including a requirement that Georgia nullify certain provisions of its Constitution. Ibid. Arkansas, which had already ratified the Fourteenth Amendment, was readmitted by Act of June 22, 1868, 15 Stat. 72. Virginia was readmitted by Act of Jan. 26, 1870, 16 Stat. 62; Mississippi by Act of Feb. 23, 1870, 16 Stat. 67; and Texas by Act of Mar. 30, 1870, 16 Stat. 80. Georgia was not finally readmitted until later, by Act of July 15, 1870, 16 Stat. 363.

 Discussing the bill which eventuated in the Act of June 25, 1868, see note 41, supra, Thaddeus Stevens said:
“Now, sir, what is the particular question we are considering ? Five or six States have had submitted to them the question of forming *737 constitutions for their own government. They have voluntarily formed such constitutions, under the direction of the Government of the United States. . . . They have sent us their constitutions. Those constitutions have been printed and laid before us. We have looked at them; we have pronounced them republican in form; and all we propose to require is that they shall remain so forever. Subject to this requirement, we are willing to admit them into the Union.” Cong. Globe, 40th Cong., 2d Sess., 2465 (1868). See also the remarks of Mr. Butler, infra, p. 606.
The close attention given the various Constitutions is attested by the Act of June 25, 1868, which conditioned Georgia’s readmission on the deletion of “the first and third subdivisions of section seventeen of the fifth article of the constitution of said State, except the proviso to the first subdivision . . . .” 15 Stat. 73. The sections involved are printed in Sen. Ex. Doc. No. 57, 40th Cong., 2d Sess., 14-15.
Compare United States v. Florida, 363 U. S. 121, 124-127.

 See, e. g., Cong. Globe, 40th Cong., 2d Sess., 2412-2413, 2858-2860, 2861-2871, 2895-2900, 2901-2904, 2927-2935, 2963-2970, 2998-3022, 3023-3029 (1868).

 Cong. Globe, 40th Cdng., 2d Sess., 3090-3091 (1868).

Id., at 3092.

 Ala. Const., 1867, Art. VIII, §1; Fla. Const., 1868, Art. XIV; Ga. Const., 1868, Art. Ill, § 3, ¶ 1; La. Const., 1868, Tit. II, Art. 20; N. C. Const., 1868, Art. II, § 6; S. C. Const., 1868, Art. II, §§ 6, 8.

 N. C. Const., 1868, Art. II, § 6. There were 90 counties. Census 52-53.

 Ibid.

 S. C. Const., 1868, Art. II, § 8; Census 60.

 Fla. Const., 1868, Art. XIV.

 Census 18-19.

 Ala. Const., 1875, Art. IX, §§ 2, 3; Ala. Const., 1901, Art. IX, §§ 198, 199.

 Fla. Const., 1885, Art. VII, § 3.

 Ga. Const., 1877, Art. Ill, § III.

 La. Const., 1879, Art. 16.

 Miss. Const., 1890, Art. 13, § 256.

 Mo. Const., 1875, Art. IV, § 2.

 Mont. Const., 1889, Art. V, §4, Art. VI, §4.

 N. H. Const., 1792, Part Second, §§ IX-XI, XXVI, as amended.

 N. H. Const., 1902, Part Second, Arts. 9, 10, 25.

N. Y. Const., 1894, Art. Ill, §4.

 N: Y. Const., 1894, Art. Ill, § 5.

 N. C. Const., 1876, Art. II, § 5.

 Okla. Const., 1907, Art. V, § 10.

 Pa. Const., 1873, Art. II, § 17.

 S. C. Const., 1895, Art. Ill, §§ 4, 6.

 Utah Const., 1895, Art. IX, § 4.

 Wyo. Const., 1889, Art. Ill, § 3.

 A tabular presentation of constitutional provisions for apportionment as of Nov. 1, 1961, appears in The Book of the States 1962-1963, 58-62. Using this table, but disregarding some deviations from a pure population base, the Advisory Commission on Intergovernmental Relations states that there are 15 States in which the legislatures are apportioned solely according to population. Apportionment of State Legislatures (1962), 12.

 Compare the Court’s statement in Guinn v. United States, 238 U. S. 347, 362:
“. . . Beyond doubt the [Fifteenth] Amendment does not take away from the state governments in a general sense the power over suffrage which has belonged to those governments from the beginning and without the possession of which power the whole fabric upon which the division of state and national authority under the Constitution and the organization of both governments rest would be without support and both the authority of the nation and the State would fall to the ground. In fact, the very command of the Amendment recognizes the possession of the general power by the State, since the Amendment seeks to regulate its exercise as to the particular subject with which it deals.”

 The quoted phrases are taken from the Jurisdictional Statement, pp. 13, 19.

 In two early cases dealing with party primaries in Texas, the Court indicated that the Equal Protection Clause did afford some protection of the right to vote. Nixon v. Herndon, 273 U. S. 536; Nixon v. Condon, 286 U. S. 73. Before and after these cases, two eases dealing with the qualifications for electors in Oklahoma had gone off on the Fifteenth Amendment, Guinn v. United States, 238 *747 U. S. 347; Lane v. Wilson, 307 U. S. 268. The rationale of the Texas cases is almost certainly to be explained by the Court’s reluctance to decide that party primaries were a part of the electoral process for purposes of the Fifteenth Amendment. See Newberry v. United States, 256 U. S. 232. Once that question was laid to rest in United States v. Classic, 313 U. S. 299, the Court decided subsequent eases involving Texas party primaries on the basis of the Fifteenth Amendment. Smith v. Allwright, 321 U. S. 649; Terry v. Adams, 345 U. S. 461.
The recent decision in Gomillion v. Lightfoot, 364 U. S. 339, that a constitutional claim was stated by allegations that municipal lines had been redrawn with the intention of depriving Negroes of the right to vote in municipal elections was based on the Fifteenth Amendment. Only one Justice, in a concurring opinion, relied on the Equal Protection Clause of the Fourteenth Amendment. Id., at 349.

 The measures were adopted on July 12, 1962. The District Court handed down its opinion on July 21, 1962.

 In reversing an initial order of the Circuit Court for Anne Arundel County dismissing the plaintiffs' complaint, the Maryland Court of Appeals directed the lower court to hear evidence on and determine the plaintiffs’ constitutional claims, and, if it found provi *749 sions of the Maryland Constitution to be invalid, to “declare that the Legislature has the power, if called into Special Session by the Governor and such action be deemed appropriate by it, to enact a bill reapportioning its membership for purposes of the November, 1962, election.” Maryland Committee for Fair Representation v. Tawes, 228 Md. 412, 438-439, 180 A. 2d 656, 670. On remand, the opinion of the Circuit Court included such a declaration. The opinion was filed on May 24, 1962. The Maryland Legislature, in Special Session, adopted the “emergency” measures now declared unconstitutional seven days later, on May 31, 1962.

 The Virginia Constitution, Art. IV, § 43, requires that a reapportionment be made every 10 years.

 The 1962 reapportionment acts were approved on Apr. 7, 1962. The complaint was filed on Apr. 9, 1962.

 The District Court handed down its opinion on Nov. 28, 1962, and gave the Virginia General Assembly until Jan. 31, 1963, “to enact appropriate reapportionment laws.” 213 F. Supp., at 585-586. The court stated that failing such action or an appeal to this Court, the plaintiffs might apply to it “for such further orders as may be required.” Id., at 586.

 On Dec. 15, 1962, The Chief Justice granted a stay pending final disposition of the case in this Court.

 The Delaware Constitution, Art. XVI, § 1, requires that amendments be approved by the necessary two-thirds vote in two successive General Assemblies.

 The District Court thus nailed the lid on the “box of time” in which everyone seemed to it “to be trapped.” The lid was temporarily opened a crack on June 27,1963, when Mr. Justice Brennan *752 granted a stay of the injunction until disposition of the case by this Court. Since the Court states that “the delay inherent in following the state constitutional prescription for approval of constitutional amendments by two successive General Assemblies cannot be allowed to result in an impermissible deprivation of appellees’ right to an adequate voice in the election of legislators to represent them,” post, p. 711, the lid has presumably been slammed shut again.

 In New York and Cobrado, this pattern of conduct has thus far been avoided. In the New York case (No. 20, post, p. 633), the. District Court twice dismissed the complaint, once without reaching the merits, WMCA, Inc., v. Simon, 202 F. Supp. 741, and once, after this Court’s remand following Baker v. Carr, supra, 370 U. S. 190, on the merits, 208 F. Supp. 368. In the Colorado case (No. 508, post, p. 713), the District Court first declined to interfere with a forthcoming election at which reapportionment measures were to be submitted to the voters, Lisco v. McNichols, 208 F. Supp. 471, and, after the election, upheld the apportionment provisions which had been adopted, 219 F. Supp. 922.
In view of the action which this Court now takes in both of these cases, there is little doubt that the legislatures of these two States will now be subjected to the same kind of pressures from the federal judiciary as have the other States.

 It is not mere fancy to suppose that in order to avoid problems of this sort, the Court may one day be tempted to hold that all state legislators must be elected in statewide elections.

 Ante, p. 579.

 Ante, pp. 579-580.

 Ante, p. 580.

 Ibid.

 Ibid.

 Ibid.

 Ante, pp. 576-577.

 Davis v. Mann, post, p. 691.

 Id., at 692.

 Lucas v. Forty-Fourth General Assembly, post, p. 736.

 Ante, p. 581.

 The Court does note that, in view of modern developments in transportation and communication, it finds “unconvincing” arguments based on a desire to insure representation of sparsely settled areas or to avoid districts so large that voters’ access to their representatives is impaired. Ante, p. 580.

A11 page references are to Cong. Globe, 39th Cong., 1st Sess. (1866).

AU page references are to Cong. Globe, 39th Cong., 1st Sess. (1866).